Filed 12/12/14  In re E.O. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.O., a Person Coming Under the Juvenile Court Law. | B253544 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MONICA T.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK49385) |

        APPEAL from a judgment and order of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Affirmed.

        Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Sarah Vesecky, Deputy County Counsel for Petitioner and Respondent.

———————————————

**INTRODUCTION**

Mother Monica T. appeals from the juvenile court's jurisdictional finding under Welfare and Institutions Code[1] section 300 and disposition order under section 361 removing her daughter E. from her care. Mother also alleges that the court erred in denying her request for a continuance of the disposition hearing. We affirm because the jurisdictional finding and the disposition order were supported by substantial evidence that Mother's methamphetamine use and addiction inhibited her ability to provide E. regular care and posed a substantial risk of danger to E.'s safety and physical and emotional well-being. The court did not abuse its discretion in denying the continuance, as granting it would have violated the time limit for the disposition hearing under section 352, subdivision (b).

**FACTS AND PROCEDURAL BACKGROUND**

Mother and Father (the Parents) have more than a decade long history of methamphetamine use. Due to their drug use, their two eldest children were removed from their custody in 2002. Mother has another son by a different father who was also removed from her custody at that time. The Parents never fully complied with the court ordered drug and alcohol treatment programs from that dependency case and never reunited with the children. All three boys live with the maternal grandmother, who is their legal guardian. E., the Parents' nine-year-old daughter at issue in this dependency case, was born after her brothers were placed with maternal grandmother. Although Mother and Father are married, they have been separated for the last three or four years. E. lived with Mother in the years prior to the dependency proceedings.

In 2011, Mother lost her job and moved into the maternal grandmother's home with E. Although it was intended to be a temporary arrangement, Mother lived there with E. for more than two years. During that time, Mother continued to abuse methamphetamines, which was documented by her own admissions to police and DCFS,

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

and her arrests for possession of drug paraphernalia. Also, Mother's relationship with the maternal grandmother was turbulent and resulted in altercations in the home.

In October 2011, Mother and the maternal grandmother engaged in a verbal argument regarding the children, and police responded to the disturbance. Mother admitted to the police that she was a methamphetamine user and possessed two glass pipes in her room. The police retrieved the two used pipes, which had burn marks and contained methamphetamine residue, and arrested Mother for possession of drug paraphernalia as well as for an outstanding traffic warrant. Mother also admitted to the officers that she had smoked methamphetamine on October 29, 2011, was addicted to methamphetamine, and had been using it for the past 11 years.

In May 2012, police performed a welfare check at the maternal grandmother's home because police received a report that Mother was using methamphetamine on and off. Mother told police that she had used methamphetamine during the previous weekend while camping with friends. Police searched her bedroom and found three glass pipes, which Mother asserted were not hers. Police then arrested Mother for outstanding warrants and for possession of drug paraphernalia. Notably, later that day, the maternal grandmother called the police, stating that Father was under the influence of methamphetamine and that he was trying to pick up E. from her home.

With regard to the three pipes, Mother asserted that they were not hers to DCFS in a 2013 interview. She told DCFS that "the cops came and search[ed] my bedroom that I share with the children and they found some old drug pipes." She stated that the police found a box of drug pipes under her sons' bunk beds and another pipe in the closet. Mother told DCFS that she did not know that the drug pipes were there, and believes Father called the police to investigate her because Father is angry with her. She asserted that she would never use drugs around her children, stating that "[w]hen I relapse [sic] in the past it was when [E.] was not with me, I never use [sic] when I knew I needed to be responsible for her."

3

Although Mother claimed to be drug-free in an April 2013 DCFS interview, she refused to complete a voluntary drug and alcohol test, and recognized that her refusal would "look bad."  She also refused to participate in a voluntary Up Front Assessment.[2]  During that interview, Mother also reported to DCFS that several weeks prior, she and the maternal grandmother had "got[ten] into it" and that the maternal grandmother claims that Mother hit her with the remote control.  Mother asserted that she did not hit the maternal grandmother and that the maternal grandmother precipitated the altercation by speaking badly about Mother's father.  In a separate interview, the maternal grandmother stated that Mother had hit her in the face with a remote control during the argument, but that she did not think it was on purpose.

Mother's children also indicated deficiencies in Mother's parenting and conflicts at home.  E. stated that she witnessed Mother and the maternal grandmother arguing.  She stated:  "Sometimes. They scream a lot. Sometimes they wake me up."  In another interview with DCFS, which occurred after Mother moved out of maternal grandmother's home, E. stated that she did not want to live with Mother.   E. explained that Mother "sleeps all day long and does not pay much attention to her."  E.'s brothers corroborated that when Mother was living with them at maternal grandmother's house, Mother slept a lot and was not involved in their everyday activities, despite Mother being unemployed.  When questioned about this, Mother admitted to sleeping a lot because she was feeling depressed.  The overall environment appeared to have a negative effect on E., who Mother described as "a very emotional child."  Mother reported that E. was in therapy due to the Parents' separation, their move to maternal grandmother's home, and "the instability of everything in her life."

---

[2]    Up Front Assessments are performed by family preservation agencies at the request of DCFS and use a standardized assessment tool to evaluate caretaker capacity. Participation by the caretaker is voluntary.  (See http://lacdcfs.org/reunitingfamilies/docs/ Up-Front%20Assessments%20(UFA)%20Info%20list.pdf (as of December 12, 2014).)

Furthermore, in June 2013, during DCFS's investigation, Mother disappeared with E. for a short period of time and could not be reached. At that time, Father stated to DCFS that Mother panicked and cut off contact with people upon learning that DCFS was investigating their case. Father stated that Mother went into hiding with E. Mother and E. were eventually located. At the June 20, 2013 detention hearing, the court detained E. from Mother's custody, and DCFS subsequently placed E. in the home of her paternal grandmother.

DCFS provided the Parents with referrals for counseling, parenting education, domestic violence, outpatient/inpatient drug treatment programs, and random drug testing, as well as monthly bus passes to facilitate their participation in the programs. In its December 9, 2013 last minute information report to the court, DCFS stated that Mother had not provided any information indicating that she was enrolled in individual counseling or domestic violence and parenting programs. On September 3, 2013, Mother had told DCFS that she would be moving to a Christian based rehabilitation home. A few weeks later, Mother reported to DCFS that the program was not assisting her with the DCFS case plan and was not allowing her to visit her daughter. DCFS referred Mother to another rehabilitation program called Prototypes. At the time of the December 9, 2013 last minute information report, DCFS had not been able to verify Mother's enrollment in Prototypes. The report also stated that Mother failed to show up for drug tests from August to October 2013. Mother was previously informed that a missed drug test would count as a dirty test. DCFS submitted all of the above information to the court in reports prior to or at the jurisdiction and disposition hearing on December 9, 2013.

At the December 9, 2013 hearing, Mother moved to admit into evidence a letter dated December 8, 2013 from her Prototypes counselor, addressed to "Whom It May Concern." The letter stated that Mother had been enrolled in Prototypes, a substance abuse rehabilitation program with regular drug testing, since October 8, 2013. The Prototypes counselor stated that the facility also offered individual counseling, parenting classes, and other programs. The letter reported that Mother was in compliance with Prototypes and "shows great attitude towards her obtaining sobriety."

The Prototypes counselor further wrote that: "[Mother] and I, her counselor have made over ten attempts to contact her social worker and her social workers [*sic*] supervisor with no response or call backs. [Mother] has tried to contact to establish her visits and her UA testing for DCFS, and again no response. [Mother] has worked very hard and finally has established on her own a visit day and time to visit with her daughter. She has yet to have receive [*sic*] a bus pass as she is now going to meetings and her doctor appointments. [Mother] has worked through her struggles personally and through the issues of the difficulty of establishing a rapport with DCFS." The letter requested clear orders on what Mother needed to do to obtain custody of her daughter, and offered to allow Mother to have overnights with her daughter and to have E. live at Prototypes with Mother if Mother gained custody of E. while she was still in treatment. The court admitted the letter over DCFS's objection that the letter lacked foundation and DCFS lacked the opportunity to verify the letter.

In addition, DCFS provided evidence that Father was unemployed and homeless or living with his mother or friends on a temporary basis during DCFS's investigation in 2013. DCFS's reports indicate that although E. appears to have a good relationship with Father and Father wanted to be her caregiver in the future, he was unable to provide E. a home. Father also appears to have continuing drug abuse problems, for which DCFS provided him referrals. Father had consistently tested negative for drugs during random testing, but he was discharged from his substance abuse program at Mid Valley Recovery Services, Inc. on October 28, 2013, due to "abandonment of treatment."

Based on this information, the juvenile court sustained DCFS's section 300 petition for E. on two counts. First, it sustained count b-1, which provided that Mother "has a thirteen-year history of illicit drug abuse and is a current abuser of methamphetamine, which renders the mother incapable of providing regular care for the child." Count b-1 also stated that Mother had been under the influence of methamphetamine on multiple occasions while E. was in the mother's care and supervision and that drug pipes were found in the home Mother shared with E., within E.'s reach. Count b-1 further alleged that E.'s three brothers were removed from

Mother's custody due to Mother's illicit drug use. Count b-1 concluded that Mother's drug use endangered E.'s physical health and safety, placing her at risk of physical harm and damage.

Second, the Court sustained count b-3 that Father has a "thirteen-year history of substance abuse, and is a frequent user of methamphetamine, which renders the [F]ather incapable of providing regular care for [E.]." Count b-3 stated that E.'s siblings were removed from Father's custody due to his illicit drug use. Count b-3 alleged that "father's use of illicit drugs endangers the child's physical health and safety and places the child at risk of physical harm and damage."

In its minute order, the juvenile court expressly found that "[s]ubstantial danger exists to the physical health of [E.] and/or [E.] is suffering severe emotional damage, and there is no reasonable means to protect without removal from parent's or guardian's physical custody." The court also found that "[r]easonable efforts have been made to prevent or eliminate the need for removal of the minor from the home of parent(s)/legal guardians(s)."

Explaining its findings at the hearing, the court stated "that with respect to both Mother and Father they have not adequately addressed their long substance abuse history. And they each have unresolved substance history." The court noted that Mother and Father both "are currently on summary probation due to drug related charges." The court stated that "Mother and Father openly admit to their drug history and each deny use, but there is nothing before the court to show this history has been resolved. [¶] For the Mother, she just recently enrolled in a program. However, the Mother has been a no show for drug testing on 10-18, 10-3, 9-3, and 8-21. [¶] For the Father, the Father reports that he enrolled [in an] outpatient drug treatment program on 9-3-2013. However, the Father was discharged from the program on 10-28-2013 for abandonment of treatment." The juvenile court further noted that E.'s siblings have been permanently removed from the Parents "due to the Mother[']s illicit drug use, unresolved drug use . . . ."

7

After the court rendered its jurisdictional findings, counsel for Mother requested a continuance of the disposition hearing to early January for DCFS to investigate the letter from Prototypes, for Mother to have her Prototypes drug counselor appear in court, and for Mother to obtain information showing that Prototypes would allow E. to be placed in the program with Mother. The juvenile court held that it would not continue the matter. The court noted that "this petition . . . was filed originally in June and the First Amended [Petition] was filed in August and this matter was set for contest back on August 14th, 2013." The court found that "it would be detrimental to further delay this matter given that the parties have had several months concerning the petition."

## DISCUSSION

*1.     Standards of Review*

Mother appeals the court's jurisdictional findings, disposition order, and denial of her request for a continuance. We review the juvenile court's jurisdictional findings and disposition orders for substantial evidence. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966.) "Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value." (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) Although substantial evidence may consist of inferences, the inferences " 'must be "a product of logic and reason" and "must rest on the evidence" [citation*]; inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].' " (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.) Conflicts in the evidence and reasonable inferences are resolved in favor of the prevailing party. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) "[I]ssues of fact and credibility are questions for the trier of fact." (*Ibid.*) The juvenile determination will not be disturbed unless it exceeds the bounds of reason. (*Ibid.*)

"[T]he juvenile court has discretion to grant a continuance upon a showing of good cause if it is not contrary to the best interest of the child." (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481; § 352, subd. (a).) We review the juvenile court's denial of a continuance request for abuse of discretion. (*In re Mary B.,* at p. 1481; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604-605; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.) "To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice." (*In re Joey G.* (2012) 206 Cal.App.4th 343, 346.)

2. *The Jurisdictional Findings Were Supported by Substantial Evidence*

Mother contends the evidence is insufficient to support the juvenile court's jurisdictional finding under section 300, subdivision (b) with regard to her ability to care for E. She asserts that DCFS failed to present evidence regarding the current circumstances or show that past conduct is likely to continue in the future. Mother does not, however, challenge the validity of the juvenile court's jurisdictional finding under subdivision (b) based on Father's substance abuse.

Because the focus of dependency proceedings is on the protection of minor children, a juvenile court need only "find that one parent's conduct has created circumstances triggering section 300," to acquire jurisdiction over a child. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 (*I.A.*).) "[I]t is commonly said that a jurisdictional finding involving one parent is ' "good against both. More accurately, the [child] is a dependent if the actions of either parent bring [the child] within one of the statutory definitions of a dependent." ' [Citation.]" (*Id.* at p. 1492.)

In the case at bar, the juvenile court exercised its dependency jurisdiction over E. based on two separate section 300, subdivision (b) counts: the first premised on Mother's inability to provide regular care for and endangerment of E. due to her methamphetamine use, and the second based on Father's inability to provide regular care for and endangerment of E. due to his drug use. Accordingly, even if we considered reversing the jurisdictional finding as to Mother under subdivision (b), the juvenile court would retain jurisdiction over E. based on the sustained and unchallenged subdivision (b)

9

allegation against Father. Therefore, Mother's attack on the jurisdictional finding relative to her conduct alone is nonjusticiable. (*I.A., supra,* 201 Cal.App.4th at pp. 1490–1491 ["An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status"].) Nonetheless, in an abundance of caution, we briefly address Mother's jurisdictional argument on the merits.

"Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness caused by the parent's inability to provide regular care for the child because of the parent's . . . substance abuse. A jurisdictional finding under section 300, subdivision (b) requires: ' "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.] The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' [Citation.]" *(In re James R.* (2009) 176 Cal.App.4th 129, 135.)

Here, Mother has more than a decade long history of substance abuse, which resulted in her losing custody of her three sons in 2002. Despite that loss, Mother has continued to use methamphetamine, and failed to complete the drug rehabilitation programs, which the court ordered in the first dependency case. Mother acknowledged that methamphetamine use caused her separation from Father and that the resulting instability has negatively impacted E. E.'s instability was compounded by Mother's job loss, moving into the maternal grandmother's home, and Mother's reoccurring conflicts with the maternal grandmother. Mother was also inattentive to her children and spent most of her time sleeping while residing with the maternal grandmother, in spite of her unemployment. In addition, Mother endangered E. by storing her methamphetamine pipes within E.'s reach in the bedroom that she shared with her children at maternal grandmother's home. Mother's use of methamphetamine has resulted in multiple

10

paraphernalia arrests in the last several years. It is evident that Mother's substance abuse has permeated her relationship with E., inhibited her ability to regularly care for E., and exposed E. to danger.

Although Mother now claims to be drug free, she refused to complete a voluntary drug and alcohol test in April 2013, recognizing that her refusal would "look bad." Thereafter, she failed to show up for four drug tests in the several months preceding the jurisdiction disposition hearing. Mother's successful two-month participation in her current drug rehabilitation program appears promising, but this alone is not sufficient to prove that she can consistently provide regular care for E., unaffected by her drug addiction. (See *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [The parents did not establish changed circumstances, as an element for modifying an order denying reunification services with respect to two children adjudicated as dependent, where the parents both had extensive histories of drug use and years of failing to reunify with their other children, and their efforts at rehabilitation were only three months old at time of hearing on their petition for modification.]; *In re Kimberly F*. (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."].) Moreover, Mother's Prototypes counselor does not state that Mother has obtained sobriety. Rather, the counselor states that Mother "is in compliance with Prototypes treatment program to date and shows great attitude *towards obtaining sobriety*." (Italics added.)

To the extent that Mother asserts the court failed to analyze present conditions, we disagree. The court accounted for Mother's enrollment in Prototypes and Mother's two months of progress in the program. The court nonetheless placed those two months of progress in perspective with the entire four months that preceded the hearing, stating that Mother "just recently enrolled in a program. However, the Mother has been a no show for drug testing on 10-18, 10-3, 9-3, and 8-21." Substantial evidence supports the court's conclusion that two months of progress toward sobriety was insufficient to rebut the concerns raised by a series of recently missed drug tests. Moreover, Mother's own evidence indicates that she is still working toward her sobriety.

Based on the foregoing, we conclude that the juvenile court's jurisdictional finding is supported by substantial evidence that Mother has an ongoing drug addiction that inhibits her ability to provide appropriate care for E. and maintain E.'s safety. There is a substantial risk that E. will suffer serious physical harm as a result of Mother's potential relapse, Mother's careless behavior in leaving drug paraphernalia with the reach of E., and the increasing instability of Mother's environment, which has already taken its toll on E. We therefore affirm the jurisdictional finding.

  *3.  Substantial Evidence Supports the Disposition Order Removing E.*

  Mother asserts that DCFS should not have removed E. from Mother's custody as there were reasonable means of preventing E.'s removal. Mother asserts that the alternative to removal was having E. live at Prototypes with Mother, which was not explored by the court.

  Under section 361, subdivision (c)(1) children may not be removed from their parent's home "unless the juvenile court finds clear and convincing evidence" of a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) Upon satisfying these prongs, the removal is appropriate even if the parent is not dangerous and the minor at issue has not yet been harmed. (*Ibid.*) "The focus of the statute is on averting harm to the child." (*Ibid.*)

As explained above with regard to jurisdiction, Mother lacks the ability to provide E. regular proper care due to her admitted addiction to methamphetamine. Mother is still working toward sobriety. If E. were to remain in Mother's care, there is substantial danger that E.'s emotional trauma would be exacerbated by increased instability, that she would be exposed to drug paraphernalia, and that Mother would be incapable of providing for her needs. Additionally, Mother's June 2013 disappearance with E. also raises concerns regarding Mother's judgment and parenting, and E.'s safety while in Mother's care.

To the extent that Mother asserts that the court failed to examine E.'s placement in Prototypes with Mother, the court lacked evidence that this was a reasonable placement option. The only piece of evidence the court had regarding possible placement at Prototypes was a letter written the day before the hearing by a Prototypes counselor. The letter states that "Prototypes will allow [Mother] to have overnights with her daughter and even if custody was regained while [Mother] was . . . still in treatment the child can come into [P]rototypes." The letter does not appear to anticipate the immediate placement of E. with Mother in Prototypes. Furthermore, the court had no evidence regarding how Prototypes would accommodate E. and ensure her health and safety. As stated above, the court's focus is on averting harm to E. Removing E. from her paternal grandmother's home and placing E. in Prototypes with Mother could increase environmental instability for this emotionally fragile child. There is a dearth of evidence to support Mother's contention that E.'s placement in Prototypes was a reasonable and safe way to prevent E.'s removal.

As the evidence establishes that Mother is incapable of regularly caring for E. and that E. would likely suffer detriment if left in Mother's care, we conclude that substantial evidence supported the court's dispositional order, removing E. from Mother's care.

*4.    The Court Did Not Abuse Its Discretion by Denying the Continuance*

Mother asserts that the court abused its discretion in denying her motion for a continuance of the disposition hearing.  Section 352 governs continuances in dependency hearings.  Continuances must be requested in writing at least two court days prior to the hearing date with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for a continuance.  (§ 352, subd. (a).)  A continuance may be granted only upon a showing of good cause, and only if it is not contrary to the interests of the minor.  (*Ibid.*) "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid*.)  Continuances are discouraged in dependency cases so that children may receive loving and secure home environments as soon as reasonably possible. (*In re Giovanni F., supra,* 184 Cal.App.4th at p. 604.)  Furthermore, section 352, subdivision (b) mandates that "In no event shall the court grant continuances that would cause the hearing pursuant to Section 361 to be completed more than six months after the hearing pursuant to Section 319."  Meaning, dispositional hearings cannot occur more than six months after detention hearings.

Here, the juvenile court afforded Mother ample time to prepare for the December 9, 2014 disposition hearing, as the court stated "this petition . . . was filed originally in June and the First Amended [Petition] was filed in August and this matter was set for contest back on August 14th, 2013."  Only on the date of the hearing did Mother verbally request a continuance "to the early part of January" for DCFS to investigate the letter from Prototypes, for Mother to have her Prototypes drug counselor appear in court, and for Mother to obtain information showing that Prototypes would allow E. to be placed in the program with Mother.  Yet, Mother's counsel never showed good cause by explaining why she could not bring the motion in writing two days before the hearing, or why she was unable to come prepared to the hearing with the Prototypes counselor and with the information regarding E.'s possible placement in Prototypes with Mother.

14

Furthermore, the court lacked the ability to grant Mother's requested continuance to early January, as the continuance would have violated the time limit for the disposition hearing set forth in section 352, subdivision (b). The court held the detention hearing on June 20, 2013. Mother made the continuance request at the jurisdiction and disposition hearing on December 9, 2013, which was five months and twenty days after the detention hearing. Section 352, subdivision (b) requires the disposition hearing to be held within six months of the detention. If the court continued the hearing to January as Mother requested, it would have exceeded the maximum six month time frame for the disposition hearing mandated by statute.

In sum, Mother's request for a continuance was not supported by a showing of good cause and would have violated section 352, subdivision (b). We therefore conclude that the court did not abuse its discretion in denying the continuance.

## DISPOSITION

The juvenile court's judgment finding jurisdiction, dispositional order, and denial of the continuance are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.

15